## Pleasants' Appeal.

1. Bowen, domiciled in Philadelphia, devised all his "real and personal property in Jamaica," part being slaves, which there were real estate; after the date of the will, and during his life, Parliament passed an act, by which slaves were set free, and appropriated money to compensate their holders; after testator's death, his proportion was ascertained by commissioners under the act and paid to his executors. *Held*, that the act was a conversion into personalty before his death, and a revocation of the devise, and that the compensation received was not substituted for it.

2. The testator being domiciled in Philadelphia, the compensation did not pass under the will as " property in Jamaica;" it followed the person of the testator.

3. The testator authorized his executors to sell all his property and invest the proceeds "in some safe and productive stock, * * * either in Jamaica or the United States;" they invested in United States Bank stock, in July 1826, the bank being then in good repute and the stock selling above par; it failed in about a year and the investment was lost. *Held*, that the executors were not responsible.

February 3d 1875. Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Appeal from the Orphans' Court of *Philadelphia:* No. 168, to July Term 1872.

In the estate of Austin Montgomery, deceased, sur account of The Pennsylvania Company for Insurance on Lives, &c., administrators d. b. n. c. t. a. of said deceased.

The controversy in this case arose under the will of John Bowen, who died March 4th 1835, having made his will, dated November 20th 1830, and proved June 17th 1835; letters testamentary were issued to Martha P. Bowen and Austin Montgomery, the executors named in it. At the date of his will and at the time of his death, the testator was domiciled in Philadelphia.

The will contained these provisions:

" I give, &c., unto my wife, Martha P. Bowen, all my real and personal estate and property in the island of Jamaica, * * * during her natural life, provided that she continue unmarried; but if my said wife should again marry, then my will is * * * she shall receive only one-third part of the income thereof during her life. Upon the death of my said wife or her marrying again, I give, &c., my said real and personal estate and property in the island of Jamaica to my son, Austin Montgomery Bowen, and my daughter, Isabella M. Bowen—my son to take two third parts, * * * and my daughter to take one third part as tenants in common, subject, however, should my wife have married again, to the payment to her during her life by my said son and daughter, of one-third of the income thereof. * * * But, notwithstanding the foregoing devises and bequests, I hereby authorize and empower my executrix and executor, and the survivor of them, whenever they or the survivor of them, at any time before my said son shall attain the age of twenty-one years, shall think it expedient so to do, to sell my said real and personal estate and property in the island of Jamaica. * * *

" Should such sale be made, * * * I order and direct that the proceeds of such sale shall be invested by my executrix and executor, &c., in some safe and productive stock, mortgages or other real security, either in Jamaica or the United States of America; and if my said wife shall then be living and unmarried, that the whole of the income of the said proceeds of sale so invested (after deducting expenses) be paid to my said wife for her use while she continues unmarried. But if my said wife should at the time of the said sale be again married, or should subsequently marry, then my will is, * * * she shall receive only one-third of the income or interest thereof, to be paid to her annually, during her life." * *

[Upon the marriage or death of his wife the proceeds of sale were to be divided between his son and daughter, as was directed as to the real estate.]

" It is my will, that if either of my said children should die under the age of twenty-one years, unmarried, and without issue, the share * * * bequeathed to the child who shall so die, shall go to my surviving child, * * * but if both of my said children should die under the age of twenty-one years, unmarried, and without issue, then * * * the real estate and property in

the island of Jamaica, and the proceeds thereof, if sold, * * * I hereby give to my sister, Isabel B. Montgomery, wife of Austin Montgomery, to hold the same to her for her own use during her life, and, upon her death, then to my brothers, Ralph W. Peacock and George S. Peacock, their heirs, executors, administrators and assigns, share and share alike, as tenants in common.

" All the rest, residue and remainder of my estate, both real and personal, I give, devise and bequeath to my beloved wife, Martha P. Bowen, to hold to her, her heirs, executors, administrators and assigns."

At the date of the will, the testator owned a plantation, with 130 slaves thereon, called the Bowen Hall estate, and situate in the parish of Vere, in the island of Jamaica.  This is variously described in his will, above recited, as " all my real and personal estate and property in the island of Jamaica," or " the real estate in Jamaica," or " the real estate and property in the island of Jamaica."  Under the laws of Jamaica slaves were real estate.

On the 28th of August 1833, the British Parliament passed " An Act for the abolition of slavery throughout the British colonies, &c., 3 & 4 Wm. IV., c, 73, wherein it was provided that on and after the 1st day of August 1834, all persons held in slavery within any British colony should become and be, to all intents and purposes, free and discharged of and from all manner of slavery, and be absolutely and for ever manumitted ; and that in order to compensate the persons entitled to the services of the slaves for the loss of such services, 20,000,000*l*. should be set aside, and, by commissioners to be appointed by the crown, apportioned amongst the several slave colonies, and afterwards divided amongst the holders of the slaves.   The material clauses of the Act of Parliament, are given at large in the opinion of Judge Mercur.   The slaves were set free August 1st 1834.

The commissioners were authorized to frame rules, regard being had to the laws and usages of the respective colonies, for securing the just and equitable distribution of the funds, &c. ; the rules to be submitted to the Privy Council, and upon being confirmed by them, to be certified to the Court of Chancery, there to remain of record and be of the same validity as if made by Parliament.

Rules were accordingly prepared, submitted and confirmed by the Privy Council, March 10th 1835.   Amongst others, were the following :

That in respect to all persons who, as owners or creditors, legatees or annuitants, may have any joint or common interest in any slave or slaves, or may be entitled to or interested in any slave or slaves, either in possession, remainder, reversion or expectancy, the compensation-moneys to be awarded in respect of such slave or slaves shall be deemed to be of the same nature and impressed

with the same character for all purposes whatsoever, so far as the same can be so taken and applied, as the slave or slaves in respect of whom such moneys shall be allotted, and shall be subject to the same rules of distribution, and to the same charges and liabilities as the same slave or slaves respectively would have been subject to, according to the several estates and interests of the parties entitled thereto, and agreeably to the law and usages of the particular colony in which such slave or slaves may be registered or settled.

That the compensation-moneys to be awarded in respect of any slave or slaves subject to any trusts or powers whatsoever, shall be subject to the same trusts or powers in all respects as the same slave or slaves were subject to.

That in case of the death of any person entitled to such compensation-moneys who may die intestate before the award of such compensation, the succession to such moneys shall be the same as the succession to the interest in the slave or slaves in respect of whom the compensation shall be allotted according to the law of the particular colony in which such slave or slaves were registered or settled.

The testator did not live to receive the compensation-money. All the devisees and legatees named in his will survived him ; but his two children died under the age of twenty-one years, unmarried and without issue. On the 19th June 1835, the executors filed an "inventory of the household goods and furniture of the late John Bowen," their appraised value amounting to $2384.50. No other inventory was filed.

On the 5th of October 1835, the commissioners of compensation awarded to Martha P. Bowen and Austin Montgomery 2751*l.* 3*s.* 1*d.* for the slaves.

On the 12th of March 1836, the amount of this award, with interest, $13,767.69, was paid to the executors ; of this sum they invested on the 7th of July 1836, $12,950.79 in the stock of the Bank of the United States, chartered by the Commonwealth of Pennsylvania on the 7th of July preceding. The bank suspended specie payments in May 1837, and failed in February 1841 ; the whole investment was lost. The executors of Mr. Bowen never filed an administration account. Mrs. Bowen died unmarried on the 15th of July 1849, leaving a will by which she directed as follows :

"I direct that so much of my six per cent. bonds of the city of Cincinnati as may be necessary for the purpose be sold, and the proceeds thereof to be applied as a repayment to the Bowen Hall estate in the island of Jamaica for certain moneys received from the sale of land belonging to the estate, and which moneys have been used in the management of the said estate." And she appointed J. Fisher Leaming and John Bowen, late Ralph W. Peacock, executors. The auditor of Mr. Leaming's accounts, reported

as to the power of sale given to her and her co-executor by the
will of John Bowen: "The power of sale appears to have been
partially exercised (whether adequately or not the auditor does
not undertake to determine), and the proceeds, amounting to about
$2600, received by Mrs. Bowen. Austin Montgomery, surviving
executor of John Bowen, and husband of Mrs. Isabel B. Mont-
gomery, claimed the sum of $2639.32, with interest from July 5th
1849, for moneys received from the Bowen Hall estate by Mrs
Bowen during her lifetime, and which she directed to be repaid
to that estate by the clause in her will, already recited. This
claim was admitted to be correct by the executor of Mrs. Bowen."

After Mrs. Bowen's death, Mrs. Isabel B. Montgomery the next
life-tenant, found the Jamaica estate in a very low condition, the
buildings dilapidated, &c., and stock wanting. ৲ She did not make
any repairs to the houses, but authorized her agents in Jamaica
to expend money for wages of labor, and restocking the place, so as
to bring it into cultivation. On a settlement with her agents, on
the 23d of September, she was found to be indebted to them
$2286.37; her husband, Austin Montgomery, paid this amount to
the agent on the 9th of December 1850.

On the 21st of May 1851, Mr. Leaming, the executor, &c., of
Mrs. Bowen, paid to Austin Montgomery, as executor, &c., of
Bowen, $2929.51 in full, principal and interest of the amount
directed by Mrs. Bowen's will to be repaid to her husband's estate.
On the final settlement of Mrs. Bowen's estate, it was ascertained
that it would not pay its creditors in full, and on the 18th of Au-
gust 1854, the auditor reported that Mr. Montgomery, the executor,
should refund $431.93 of the $2929.61 which had been paid to
him as surviving executor of Mr. Bowen's will; it was accord-
ingly repaid. At this audit, John Bowen (whose name had been
changed by Act of Assembly from Ralph W. Peacock), one of the
remainder-men, in his own right, and as administrator, &c., of
George S. Peacock, the other remainder-man, claimed indemnity
for losses from the investment of the funds of Bowen, the testator,
in the stock of the Bank of the United States; the auditor dismissed
the claim, chiefly for reasons not involving the question of the
propriety of the investment.

On the 29th of January 1855, Austin Montgomery, as surviving
executor, &c., of Bowen, the testator, executed to Leaming, the
executor, &c., of Mrs. Martha P. Bowen, the other executor, a
release of all demands which he might have against him individu-
ally or as executor, or by reason of the claim of the remainder-men,
set forth in the above-mentioned auditor's report.

Austin Montgomery died November 5th 1855, having made his
will, dated January 27th 1851, giving all his estate to his wife,
Isabel B. Montgomery; he appointed her his executrix; letters
testamentary were issued to her November 13th 1855, but she

never filed any inventory or account. She died December 16th 1865, having made a will, of which John T. Montgomery and Edward E. Law were appointed executors, to whom, after some controversy as to the validity of the will, letters testamentary were issued July 11th 1866.

After the death of Austin Montgomery, letters of administration, d. b. n. c. t. a. of Bowen the testator were issued to James Pleasants; he was also administrator, &c., of John Bowen (late Peacock) and George S. Peacock, the remainder-men under the testator Bowen's will.

On the 31st of April 1868, the executors, &c., of Isabel B. Montgomery filed their administration account. Before the auditor to whom it was referred, Pleasants presented claims for the $13,477.77, compensation received for slaves, and the $2929.61 repaid under Mrs. Bowen's will with interest. The executors of Mrs. Montgomery having in their hands a balance of about $119,000, by consent of all the parties, $20,000 were set aside to meet these claims, and the remainder of the balance distributed to the parties entitled under her will.

About July 10th 1869, administration d. b. n. c. t. a. of the estate of Austin Montgomery was granted to "The Pennsylvania Company for Insurance on Lives," &c. Upon the application of parties interested under the will of Bowen, the testator, the Orphans' Court appointed an auditor to state an account of the administration of Isabel B. Montgomery of the estate of Austin Montgomery, and to report the amount of assets which had come into her hands from his estate. The auditor reported, February 19th 1870, that Mrs. Montgomery had received from Austin Montgomery's estate an amount beyond all allowances, exceeding the sum set aside to meet the claims for the investment in United States Bank stock and the money repaid under Mrs. Bowen's will, and that Mrs. Montgomery's executors should be charged with the sum so set aside, which then amounted to $21,111.93. This sum was afterwards transferred to The Pennsylvania Company for Insurance on Lives, &c., as administrator, &c., of Austin Montgomery, deceased.

So far as can be gathered from the report of the auditor—in which the foregoing facts were found—and the history of the case in the appellant's paper-book, The Pennsylvania Company, &c., administrator d. b. n. c. t. a. of Austin Montgomery, deceased, settled the account of their administration, which was referred to an auditor to report distribution. He found that the accountants were chargeable with $21,111.93.

The claims which were specially before the auditor were by the representatives of R. W. Peacock (now John Bowen) and George S. Peacock, for the amount of compensation paid for the slaves; also, for the $2929.61, repaid under the direction of Mrs. Bowen's

will, to Austin Montgomery as surviving executor of Bowen the testator's will.

The auditor reported that the Act of Parliament was an equitable conversion of the slaves into personal property, citing Richard *v.* Attorney-General of Jamaica, 6 Moore's Privy Council Cases 331, a case in which the effect of the same Act of Parliament as to conversion was considered. He further reported that there being a conversion, the property, thus being personal estate, did not pass under the specific gift of all his " real and personal estate and property in the island of Jamaica," but had no locality apart from the person of the owner : it therefore followed the law of the person and passed to the widow as residuary legatee.

As regards the investment in United States Bank stock the auditor, quoting the clause in Bowen the testator's will, said that the executors " were bound to invest the money in some safe and productive stock, mortgages or other real security, either in Jamaica or the United States of America." This duty they fulfilled as far as the bulk of the fund was concerned, by investing the same in said stock of the Bank of the United States. In July 1836, when said purchase of stock was made, the stock of said bank was generally regarded as a good and safe investment by the community—by business men; was selling at about the price at which the said executor and executrix bought, viz.: \$123, which was \$23 above its par value; that it sold for as much as \$122.50 in October 1838, the fluctuations not being very great between 1836 and 1838. The bank was paying specie, and continued to do so, until about the 11th of May 1837. Not only was its reputation good, but its character was good so far as any ordinary person, cautious and seeking for information, could then discover, if he had scrutinized its affairs ; * * * The dividends on the stock were such as to characterize the stock as " productive" also. * * *

It would be altogether contrary to equity to hold that Austin Montgomery, having power to invest in a " safe and productive *stock*," was not authorized to invest in the United States Bank stock in July 1836. And having once made a proper investment, he could not be held liable for not selling it at a loss before the bank failed. * * * Upon the foregoing hypothesis, that portion of the compensation fund which was not invested, the said Austin Montgomery would be obliged to account for.

In reference to the balance of the sum \$2929.61 repaid under the directions of Mrs. Bowen's will, he reported : " It must be assumed that the sale of land spoken of by Mrs. Bowen in her will, was one made during the minority of her son, and a valid one. It is further submitted that the direction to repay money to Bowen Hall estate was not intended as a gift but an honest restoration by Mrs. Bowen to the estate of her husband of a sum equal to the principal money she had received from a sale of part of his estate

[Pleasants' Appeal.]

in Jamaica, and which she, as life-tenant, had used in the management of said estate.

The said $2929,61 being the proceeds of sale of land under the will of John Bowen, it was the plain duty of Austin Montgomery, under the 3d clause of said will, upon receiving said money, to invest the "same in some safe and productive stock, mortgages or other real security either in Jamaica or the United States of America;" and not having done so, he became responsible for the amount to all parties interested. * * *

This claim is allowed after deducting from the amount thereof the $431.93 refunded by order of court towards paying her debts, as hereinbefore mentioned, the interest to be computed on the balance from the death of Mrs. Isabel B. Montgomery. * * * The auditor cannot say that the estate of Austin Montgomery is liable for more than he received and was finally allowed to hold, viz., $2497.68, with interest. * * * He reported therefore that the estate of Austin Montgomery was liable for the balance of the amount paid him, which arose from the money repaid under the direction of Mr. Bowen's will and was paid to him. This sum, with interest to February 16th 1872, amounted to $3421.82, the remainder (after deducting costs and expenses), amounting to $17,765,21, he awarded to the executors, &c., of Isabel B. Montgomery, deceased.

James Pleasants filed exceptions to the report of the auditor; they were quite voluminous, but raised the following questions :

Who were the persons entitled under the will of John Bowen, the testator, to the money received as compensation for his slaves; was the Act of Parliament a conversion into real estate, and if so, was the gift of his property in Jamaica specific, so that, whether real or personal, the compensation passed under it ?

The other question was whether the executors were responsible for the loss arising from the investment in the stock of the Bank of the United States.

The Orphans' Court dismissed the exceptions and confirmed the report of the auditor.

Pleasants appealed to the Supreme Court, and assigned for error, that the Orphans' Court erred in dismissing the exceptions and confirming the report of the auditor.

*R. H. McGrath* and *J. E. Gowen* (with whom was *S. Hood*), for appellants, argued in support of the following propositions :

By the Emancipation Act and the rules made under them, the compensation-money was a substitute for the slaves, and was deemed to be of the same nature and impressed with the same character for all purposes whatsoever as the slaves in respect of whom such money was allotted, and was subject to the same rules of distribution as the slaves would have been subject to.

[Pleasants' Appeal.]

The compensation-money was not subject to the ordinary rules for the devolution of property, but the Emancipation Act and the rules under it provide and enact a complete and special code or system for the distribution of the compensation fund, and exempt and withdraw it from the ordinary rules of law respecting debts and choses in action, conversion, implied revocation, ademption, the *lex loci rei sitæ*, and after-acquired property.

By the will of John Bowen, his real and personal estate in the island of Jamaica,—which would include this compensation-money substituted for the slaves,—passed to his widow for life, and on her death, after the death of her children, to Isabel B. Montgomery for life, and on her death absolutely to Ralph W. and George S. Peacock, whose estates are represented by the appellant.

The investment of the compensation-money, when received, by the executors of John Bowen's will, in the stock of the Bank of the United States in 1836, where it was lost, was not an investment in a "safe and productive stock" under the direction contained in his will, and they are liable to the appellant for the loss occasioned thereby.

Appellant's claim is not barred by lapse of time, he having no right of action until the death of Mrs. Montgomery, the life-tenant, in 1865.

As to the question of conversion, Richards *v.* Attorney General, cited by the auditor, is not binding on our courts : Cathcart *v.* Robinson, 5 Peters 280 ; Koontz *v.* Krable, 16 Md. 555 ; Skelly *v.* Bank, 9 Ohio St. 616 ; Lebanon Bank *v.* Mangan, 4 Casey 452. The money appropriated by Parliament was a mere donation to be accepted on its conditions : Kellogg *v.* Waite, 12 Allen (Mass.) 529. The Act of Parliament did not vest the money ; that was accomplished by the award of the commissioners : Vanhorne *v.* Dorrance, 2 Dall. 317; United States *v.* Wells, 2 W. C. C. 161.

The devise was not revoked by the Act of Parliament : Taylor's Settlement, 1 Hare 596 ; Walker's Case, 21 Law & Eq. 85 ; Stewart & Harner's Trusts, 5 De G. & J. 483 ; Count's Estate, 4 Id. 503 ; Pennell's Appeal, 8 Harris 515 ; Lloyd *v.* Hart, 2 Barr 473 ; Hayes' Appeal, 2 P. F. Smith 449. The executors were responsible for loss by the investment in Bank of United States stock : Hemphill's Appeal, 6 Harris 303 ; Nyce's Estate, 5 W. & S. 254 ; Pray's Appeal, 10 Casey 108 ; Worrell's Appeal, 11 Harris 48. The suspension of specie payments by the bank should have put the executors on their guard : Morris *v.* Wallace, 3 Barr 319 ; Ihmsen's Appeal, 7 Wright 431 ; Wills' Appeal, 10 Harris 325 ; Hill on Trustees 583 ; McCahan's Appeal, 7 Barr 56 ; Jones' Appeal, 8 W. & S. 150.

*G. M. Dallas* and *P. McCall* (with whom was *J. Sword*), for

appellees.—If specific property be given by will, the donee can take only the specific thing given; if at testator's death he does not own it, the gift is revoked: Farrar v. Winterton, 5 Beav. 1; Moore v. Raesbeck, 12 Sim. 123. Where a testator has devised land and afterwards sold it, the devise is revoked and the purchase-money is not substituted: Mayer v. Gowland, 2 Dick. 563; Bennett v. Tankerville, 19 Ves. 170; Townley v. Bedwell, 14 Id. 591; Lawes v. Bennett, 1 Cox 167; Rose v. Jessup, 7 Harris 284; Leiper's Appeal, 11 Casey 420, even where land is devised to be sold and the proceeds are given: Arnald v. Arnald, 1 Brown's C. C. 403; Newbold v. Broadknight, 1 Russ. & My. 677. Although the compensation for the slaves continued real estate, yet being a change of the thing devised, the devise was revoked: Sparrow v. Hardcastle, 3 Atkyns 802; Brydges v. Chandos, 2 Ves. Jr. 427; Knollys v. Alcock, 5 Id. 653; Cave v. Holford, 3 Id. 650; Marwood v. Turner, 3 P. Wms. 167; Abney v. Miller, 2 Atkyns 593. So where the change arises from acts over which the testator has no control: Attorney-General v. Vigor, 8 Ves. 282; Wright v. Rose, 2 Sim. & Stu. 324; Durant v. Friend, 11 Law & Eq. 2; Ludlam's Estate, 1 Harris 193; Hoke v. Herman, 9 Id. 301.

Mr. Justice MERCUR delivered the opinion of the court, May 10th 1875.

The contention in this case may be resolved into two questions. The one covered by the first four assignments of error; the other, by the sixth and seventh assignments.

The first question is, to whom, under the will of John Bowen, was given the compensation-money, subsequently paid, for the liberation of his slaves?

On the 20th of November 1832, he was the owner of a plantation, with 130 slaves thereon, situated in the island of Jamaica. On that day, being domiciled in the city of Philadelphia, he made his last will and testament. Therein and thereby he devised and bequeathed to his wife all his real and personal estate and property in the island of Jamaica, for her own use, during her natural life, provided she continued unmarried, with remainders over terminating in the persons for whose estate the appellant is administrator. All the rest, residue and remainder of his estate, both real and personal, he devised and bequeathed to his wife, her heirs and assigns. He died on the 4th of March 1835, domiciled in Philadelphia.

This will was duly proved before the Register of Wills, in Philadelphia, on the 17th of June 1835, and letters testamentary granted to the executors therein named.

At the date of the will, slaves in Jamaica were real estate. They must have been transferred by acts *inter vivos*, or by devise,

in the same manner, and with the same formalities as lands: 1 Burges' Colonial and Foreign Laws 563–4.

On the 28th of August 1833, the British Parliament passed the Act of 3 & 4 Will. IV., ch. 73. It is entitled, "An Act for the abolition of slavery throughout the British colonies; for promoting the industry of the manumitted slaves, and for compensating the persons hitherto entitled to the services of such slaves." In the preamble is recited: "Whereas, divers persons are holden in slavery within divers of his majesty's colonies, and it is just and expedient that all such persons should be manumitted and set free, and that a reasonable compensation should be made to the persons hitherto entitled to the services of such slaves, for the loss they will incur by being deprived of their right to such services." Subject to certain obligations, and a limited apprenticeship provided by the act, section 12 declares: "All and every the persons who, on the 1st day of August 1834, shall be holden in slavery within any such British colony as aforesaid, shall, upon and from, and after the said 1st day of August 1834, become and be to all intents and purposes, free and discharged of and from all manner of slavery, and shall be absolutely and for ever manumitted; and that the children thereafter to be born to any such persons, and the offspring of such children, shall, in like manner, be free from their birth; and that from and after the said 1st day of August 1834, slavery shall be and is hereby utterly and for ever abolished and declared unlawful throughout the British colonies, plantations and possessions abroad."

Sect. 24 declares: "And whereas, towards compensating the persons at present entitled to the services of the slaves to be manumitted and set free by virtue of this act, for the loss of such services, his majesty's most dutiful and loyal subjects, the Commons of Great Britain and Ireland in Parliament assembled, have resolved to give and grant to his majesty the sum of 20,000,000*l.* sterling."

Other sections of the act provide a mode for the distribution and apportionment of the fund among the several persons who may prefer claims thereon, after adequate and satisfactory provision shall have been made in the colonies respectively, for giving effect to the act.

The colonial government of Jamaica made the required provision in March 1834. Under the action of the commissioners appointed for that purpose, and under the general rules adopted, there were found to be 311,692 slaves in Jamaica, and the sum of 6,161,827*l.* 5*s.* 10¾*d.* was given to pay for them. To the executors of John Bowen, and as compensation for his slaves manumitted by said act, was awarded the sum of 2751*l.* 3*s.* 1*d.*, on the 13th of February 1836. This sum was subsequently paid over to the executors, amounting at the time of its receipt to $13,477.77.

The appellant, as the representative of the parties entitled to the remainder in the real estate devised in Jamaica, claims this fund. His counsel contend, that inasmuch as by the laws of Jamaica, the slaves were real estate at the time of the execution of the will of John Bowen, the compensation-money paid after his death being in lieu of the slaves, passed to the same devisees who would have been entitled to them had they remained real estate.

After the execution of his will and before his death, the legal *status* of his slaves had undergone a radical change. The British Parliament had exercised its transcendent powers. The 1st of August 1834 had come and gone. Slavery in Jamaica was on that day, and thenceforth, "utterly and for ever abolished." No longer could persons be there sold or purchased, devised, or inherited as slaves. Their real estate quality was then divested and fell with their bonds of slavery. Hence, at the time of John Bowen's death, and for seven months next preceding it, he owned no slaves. Whether they had been taken from him, with or without his consent, they had, nevertheless, in fact and by law, been taken, and he did not die owning them. They had ceased to have the specific existence which they had when the will was executed. This entire destruction of their existence as slaves, withdrew them from the operation of the will devising them as real estate. It operated as a revocation of the will *quoad hoc:* Skerrett *v.* Burd, 1 Whart. 246 ; Blackstone *v.* Blackstone, 3 Watts 335 ; Hoke *v.* Herman, 9 Harris 301. The appellant cannot invoke the aid of the statute of 1 Vict. c. 26, passed after the death of John Bowen.

As then the devisees of the real estate could not take the shares themselves, they cannot take the compensation received for them in lieu thereof. The devise was specific. It was of real estate in Jamaica. The conversion took place in the lifetime of the testator. The money received as a substitute cannot be held by said devisees: Sleech *v.* Thornington, 2 Ves. 561; Humphreys *v.* Humphreys, 2 Cox 184 ; Ashburner *v.* Maguire, 2 Bro. Ch. 108; 2 P. Wms. 330; Hoke *v.* Herman, *supra.*

It is true, at the time of the death of John Bowen, the precise amount of compensation-money to which he was entitled had not been ascertained and declared ; yet his right to a just and reasonable proportion of the 20,000,000*l.* appropriated, could not be questioned. The faith of the British government was unequivocally pledged for its payment in the Act of Emancipation.

The right of the former owner of the slaves to compensation, and the assumption of the government to make it, are clearly admitted in the title, in the preamble, and in the body of the act. It was not a right which could be enforced by an action, inasmuch as a subject cannot sue his king. This affected only the mode of its collection, not the validity or existence of the demand. It was a valid subsisting claim against the government. The government admitted its indebtedness and actually paid the money.

It is contended further, on the part of the appellant, that a proper construction of the rules framed by the commissioners and ratified by her majesty's counsel, give this compensation-money to the devisees, who would have been entitled to the slaves had they remained such at the death of the testator. Those rules may be said to constitute a part of the Act of Parliament on which they are engrafted. The 3d, 4th and 5th rules are cited as establishing this conclusion. A careful reading of them does not lead our minds to that result. The facts for which they provide do not exist in the present case. No person had any joint or common interest with John Bowen in the slaves in question; nor had any other person any interest in them, either in possession, remainder, reversion or expectancy; nor were they held subject to any trust or powers whatsoever. He was the sole owner when the Act of Parliament was passed, and so continued until it went into full effect. To him, and to him alone, was the compensation-money then due. It partook of the character of a chose in action, for the recovery of which the owner was denied a common-law right of action against the debtor, but for the payment of which a specific mode had been provided by statute. If, however, the construction to be given to this Act of Parliament was doubtful, and the general rules adopted in pursuance thereof, were uncertain and obscure, we would give great weight to a construction put on them by the court in England. Richards *v.* Attorney-General of Jamaica, 6 Moore's Privy Council Cases 381, rules this case. There Clayton, the owner of plantations and slaves thereon, in the island of Jamaica, on the 13th of June 1834, devised his real and personal estate. He died on the same day. His will was attested by two witnesses only. The law of Jamaica at that time required a will to be attested by three witnesses, in order to pass slaves or other real property. The will was, therefore, void as to the devise of real estate. After the compensation-money had been paid to the executors, a contention arose as to its distribution. The court in Jamaica held that it partook of the nature of real estate to the same extent as the slaves, and did not pass under the will. On appeal to the Privy Council the decree was reversed. In an able and exhaustive opinion, it was held, the legislature became the purchaser of the slaves under the 3 & 4 Will. IV., c. 73, from the date of the act, and that the money to be received, under the compulsory sale of the slaves, was converted into personal estate, and passed as such to the specific legatees under the will. The argument made before us, that the law did not go into full effect until the adoption of the rules, in 1835, was there made, and it was urged that the testator had died before their adoption. It was answered, "If (as they held) the act itself constituted this money personal estate, the right to it had vested before the rules were made."

It will be observed that Clayton died before the time designated

in the act for the slaves to become free; Bowen did not die until afterwards. The latter lived until their manumission had become an accomplished fact. The claim for compensation had then fully ripened. Thus fortified by the decision which an English court, composed of able judges, has put on this act, and the identical kind of property, we have no difficulty in concluding that at the time of the death of John Bowen his claim for compensation was personal estate.

The next claim made, but not strongly pressed on the argument, is, that if it was personal estate, it passed under the specific devise. To this two answers may be given: 1. The devise was of "personal estate in Jamaica." This compensation claim cannot be held to have been in Jamaica. It was due and payable in England. The language of the will was insufficient to take this claim from the residuary devisees: Hunter's Estate, 6 Barr 97; Bredlinger's Appeal, 2 Grant's Cases 461; McGlaughlin v. McGlaughlin, 12 Harris 20; German v. German, 3 Casey 116.. 2. This claim for compensation was a debt. It had in law no *situs*, but followed the person of the creditor. The *lex loci rei sitæ* is, with great propriety, disregarded. John Bowen died domiciled in the city of Philadelphia. The money collected on this claim did not, therefore, pass under the specific devise of personal estate in Jamaica: Desesbats v. Berquier, 1 Binn. 336; Guier v. O'Daniel, Id. 349, in note; Sill v. Worswick, 1 H. Black. 609.

This view of the case makes it unnecessary to consider at length the sixth and seventh assignments, which relate to the loss of the money after invested. The executors were authorized, in the words of the will, to invest "in some safe and productive stock, mortgage, or other real security, either in Jamaica or the United States of America." In July 1836, the investment was made in the stock of the Bank of the United States. The auditor has found that the stock of the bank was then generally considered a good and safe investment by the community. It was selling for $23 per share above the par value, and the market value continued about the same for several months thereafter. The bank continued to pay specie until the 11th of May 1837. Under the powers given to the executors to invest, and an honest exercise of that power, we think it would be a very harsh application of law to their sound discretion, after this great lapse of time, to hold the executors personally liable for the loss of the bank stock. They should not be held responsible for not possessing a knowledge, and not exercising a forethought, superior to the great body of intelligent and prudent business men.

Decree affirmed and appeal dismissed at the cost of the appellant.