Estate of Barnabas H. Bartol, deceased. Appeal of Henry W. Bartol, Ellis D. Williams, and the Land Title and Trust Company, Trustee for George E. Bartol, under the will of B. H. Bartol, deceased.

[Marked to be reported.]

*Trusts and trustees—Investment by trustees—Surcharge.*

A trustee will not be surcharged for a loss which has occurred to the trust estate if he has exercised common skill, common prudence and common caution; but, he will be held responsible for supine negligence or for wilful default.

*Trusts and trustees — Good faith — Investment by trustees —Will — Surcharge.*

Where a testator directs that his trustees may, in their discretion, if they deem it for the benefit of the estate, retain in their hands as assets any investments which he may have at the time of his death, without liability in case of depreciation or loss, the trustees will not be surcharged for a loss caused by depreciation in the value of the stock of a private corporation, owned by the testator at his death, and continued by the trustees as an investment.

Testator by his will authorized his trustee to invest trust funds in their hands "in first class mortgage bonds of railroad companies whose railroads are finished, and paying interest on their entire bonded debt." After the testator's death, the trustees, after consulting with the cestui que trust and other business men who had means of knowledge, also after consulting Poor's Manual and Dun & Co.'s Reports, bought with trust funds some of the consolidated mortgage bonds of a railroad company. The mortgage was a second mortgage created for the purpose of paying off a first mortgage and other debts. At the time of the investment the company was in a prosperous condition, and paying interest on its entire bonded debt. After the investment, the company built an extension to its line, and subsequently a trolley line was built in the same neighborhood, which impaired the business of the company, and depreciated the value of the bonds. There was no question as to the entire good faith and the integrity of the trustees in making the investment. *Held,* that the trustees should not be surcharged with the loss, because the railroad was not finished at the time of the investment.

*Trusts and trustees—Investments by trustees—Due care—Surcharge—Cost.*

Where an attempt is made to surcharge trustees for a loss caused by alleged improper investments, and it is established that the investments were made by the trustees with due care, and a surcharge is refused, no part of the costs will be imposed upon them.

Argued Feb. 8, 1897.   Appeal, No. 421, Jan. T., 1896, by
Henry W. Bartol et al., from decree of O. C. Delaware Co., over-
ruling exceptions to auditor's report.   Before STERRETT, C. J.,
GREEN, WILLIAMS, McCOLLUM and FELL, JJ.   Reversed.

Exceptions to report of auditor.

The auditor, Ward R. Bliss, Esq., sustained by the court
below, surcharged the trustees with $1,583.20, loss on the stock
of the John Birkbeck Company, Limited, and $5,360.30 loss
upon the bonds of the Union Railway Company of Chattanooga,
Tennessee.

The facts of the case appear by the opinion of the Supreme
Court.

*Errors assigned* were (1–7) in surcharging trustees with the
loss on the Birkbeck stock; (8–13) in surcharging trustees with
loss on the railway company's bonds; (14) in charging the
trustees with the costs of the audit.

*John G. Johnson*, with him *V. Gilpin Robinson* and *William C.
Hannis*, for appellants.—All that a court of equity requires of
a trustee is common skill, prudence and caution.   If he act as
others do with their own goods, and in good faith, he is not lia-
ble beyond what he actually receives: Chambersburg Saving
Fund Assn. App., 76· Pa. 203 ; Pleasanton's App., 99 Pa. 369 ;
Hinkle's Est., 20 W. N. C. 351; Bradley's App., 89 Pa. 514;
Calhoun's Est., 6 Watts, 185; Moore's App., 10 Pa. 435; Eys-
ter's App., 16 Pa. 372: King v. Morrison, 1 P. & W. 188;
During's App., 13 Pa. 224; Springer's App., 4 W. N. C. 23;
Conyngham's Est., 25 P. L. J. 23; Beck's Est., 5 W. N. C. 274;
Witmer's App., 87 Pa. 120; Dillebaugh's Est., 4 Watts, 177;
Derbyshire's Est., 81 Pa. 18; Stem's App., 5 Wh. 471; Sper-
ing's App., 71 Pa. 25 ; Vez v. Emery, 5 Ves. Jr. 144; Jackson
v. Jackson, 1 Atk. 513.; Johnson's App., 12 S. & R. 317;
Gochenauer v. Froelich, 8 W. 22 ; 1 Lewin on Trusts, Am.
Law Series, 294; Woodward's Est., 27 W. N. C. 407; Twad-
dell's App., 5 Pa. 15 ; Pleasanton's App., 77 Pa. 356 ; Crabb v.
Young, 92 N. Y. 56 ; Rush's Est., 12 Pa. 375.

If trustees make an improper investment, with the knowledge,
assent and acquiescence, or at the request, of the cestui que

trust, they cannot be held to make good the loss, if one happens: Cases in Perry on Trusts, sec. 467; Perry on Trusts, sec. 588; Hill on Trustees, 585.

*John F. Lewis*, with him *George B. Lindsay*, for appellee. —The finding of an auditor will not be disturbed on appeal except for flagrant error: Gilbert's App., 78 Pa. 266; Fahnestock's App., 104 Pa. 46; Lewis' App., 127 Pa. 127; Roberts' App., 126 Pa. 102; Sawtelle's App., 84 Pa. 306; McConnell's App., 97 Pa. 31; Miller's App., 102 Pa. 544; Stambaugh's Estate, 135 Pa. 585; Mehaffey's Estate, 139 Pa. 276; Fisher v. Taylor, 2 Rawle, 33; Holdship v. Patterson, 7 Watts, 547; Ashhurst v. Given, 5 W. & S. 323; Vaux v. Parke, 7 W. & S. 19; Norris v. Johnston, 5 Pa. 287·; Eyrick & Deppen v. Hetrick, 13 Pa. 488; Keyser v. Mitchell, 67 Pa. 473; Huber's Appeal, 80 Pa. 348; Patterson v. Caldwell, 124 Pa. 455; Mannerback's Estate, 133 Pa. 342; Merriman v. Munson, 134 Pa. 114; Hibbs' Estate, 143 Pa. 217; Thackara v. Mintzer, 100 Pa. 151.

That a cestui que trust who concurs in a breach of the trust is estopped from surcharging the trustee with such breach, may be law as to ordinary active trusts, but it is not the law of Pennsylvania in the case of a spendthrift trust: Watson's App., 125 Pa. 340; Shankland's App., 47 Pa. 113; Rife v. Geyer, 59 Pa. 393; Overman's App., 88 Pa. 276; Brown v. Williamson, 36 Pa. 338; Horwitz v. Norris, 49 Pa. 222.

The law of Pennsylvania has always been jealous of investments by trustees in other than legal securities: Barker's Est., 159 Pa. 521; Hemphill's App., 18 Pa. 303; Pray's App., 34 Pa. 110.

That the trustee acted with perfect good faith, and that sagacious capitalists dealing with their own money bought the same securities, is immaterial: Ihmsen's App., 43 Pa. 431; Clark v. Anderson, 13 Bush, 111.

A clear distinction is drawn by the courts between the prudence required in the current management of a trust and the definite duties imposed on the investment of funds: Neff's App., 57 Pa. 91; Jones' App., 8 W. & S. 142; Fesmire's Est., 134 Pa. 67; Ihmsen's App., 43 Pa. 431.

No amount of vigilance or prudence can excuse a departure

from the will.  Honest intentions will not protect one who
departs from the rule of prudence : Bogart v. Van Velsor, 4
Edw. Ch. 718 ; King v. Talbot, 50 Barbour, 453 ; Com. v. Mc-
Allister, 28 Pa. 480; Nyce's Est., 5 W. & S. 254; Clough v
Bond, 3 Mylne & Craig, 490 ; Hancom v. Allen, 2 Dickens, 498

Trustees may not invest in second mortgages : In re Petrie
5 Demarest, (N. Y.) 352; In re Cant, 5 Demarest, 269.

OPINION BY MR. JUSTICE GREEN, Oct 11, 1897:

In the case of Webb's Appeal, 165 Pa. 330, we reviewed at
some length the law as to the liability of trustees to be sur-
charged for loss arising from alleged negligence or fault in the
administration of their trust estates.  It ought not to be neces-
sary to restate the law on this subject, as it prevails in Pennsyl-
vania, because it is so perfectly well settled and so entirely free
from doubt.  But as we are not able to reconcile the decision
of the present contention with the law as we understand it, we
will be obliged to make reference to some at least of the princi-
pal cases.  In one of the earliest of these, Calhoun's Estate,
6 W. 185, the general doctrine was stated in reference to all
classes of trustees, in these words, " Executors and administra-
tors or trustees, acting with good faith and without any wilful
default or fraud, will not be responsible for any loss that may
arise.  All that a court of equity requires is common skill,
common prudence and common caution.  Executors, adminis-
trators or guardians are not liable beyond what they actually
receive, unless in case of gross negligence; for when they act
as others do with their own goods, and with good faith, and are
not guilty of gross negligence, they are not liable. . . . A court
of equity, as is said in Thompson v. Brown, always treated
trustees acting in good faith with great tenderness.  In Knight
v. The Earl of Plimouth, 3 Atk. 480 ; Dickens 120, Lord Hard-
wick observes if there was no mala fides, nothing wilful in the
conduct of the trustee, the court will always favor him.  For
as a trust is an affair necessary in the concerns between man
and man, and which if faithfully discharged is attended with
no small degree of trouble and anxiety, it is an act of great
kindness in any one to accept it.  To add hazard or risk to that
trouble, and to subject a trustee to losses which he could not
foresee, would be a manifest hardship, and would be deterring
every one from accepting so necessary an office."

These principles have been constantly repeated and applied in very numerous cases from that time to the present. In the following cases it was held that the measure of diligence and care required of a trustee is that which a man of ordinary prudence would practice in the case of his own estate: Witmer's Appeal, 87 Pa. 120 ; Eyster's Appeal, 16 Pa. 372 ; Fahnestock's Appeal, 104 Pa. 46. In Chambersburg Saving Fund's Appeal, 76 Pa. 203, we said: "It is well settled that a trustee shall not be surcharged for a loss which has occurred, in case he has exercised common skill, common prudence and common caution ; but for supine negligence or for wilful default he shall be held responsible."

In Pleasants' Appeal, 77 Pa. 356, the executors were authorized to invest "in some safe and productive stock." They invested in the stock of the bank of the United States. We said: "Under the powers given to the executors to invest, and an honest exercise of that power, we think it would be a very harsh application of law to their sound discretion, after this lapse of time, to hold the executors personally liable for the loss of the bank stock. They should not be held responsible for not possessing a knowledge, and not exercising a forethought, superior to the great body of intelligent and prudent business men." In that case the bank failed about a year after the investment, but we held that there was no liability for the loss, because the investment was apparently good when it was made. In Cridland's Estate, 132 Pa. 479, we sustained the adjudication of the orphans' court for the reasons stated in the opinion, among which was the following: "A trustee is not required to be infallible in his judgment nor to possess the power of anticipating events not generally looked for. Common prudence and common skill are all that is demanded, and if these are exercised, a loss arising must be borne by the estate which the testator, who is supposed to have contemplated such risks, has thought proper to confide to his care." We have held in a number of cases that an administrator is not chargeable with the consequences of a disastrous exercise of discretion, unless accompanied with such negligence as raises a presumption of wilful default: Dillebaugh's Est., 4 W. 177 ; Hughes' Appeal, 53 Pa. 500; Neff's Appeal, 57 Pa. 91 ; Derbyshire's Est., 81 Pa. 18.

It is scarcely necessary to continue the citation of authorities, which are very numerous and all to the same effect. It is only important to determine whether they are applicable to the facts of the present case.

The assignments of error practically raise two questions of surcharge and one of costs. The first question of surcharge relates to the Birkbeck stock. The testator at the time of his death owned 1,600 shares of the stock of a corporation called John Birkbeck Co., Limited, whose business was the boiling of molasses for the manufacture of sugar. B. H. Bartol, the decedent, and John Birkbeck, each, owned one half of the stock and carried on the business with much success. Both the partners died within a short time of each other and a reorganization became necessary. As each of the deceased parties owned exactly one half of the stock, it was deemed highly desirable by the accountants, trustees for George E. Bartol and his children, under the will, to preserve the equality of ownership and run no risk of disadvantage arising from a possible acquisition of a majority of the stock by the other parties in interest. In the distribution of the estate among the six parties entitled, one sixth, 266 shares, of this stock was taken for the trust estate of George E. Bartol, and these shares were subsequently held as a part of the trust estate. The business had been, and still was, very largely profitable, and heavy dividends were constantly earned and paid until the passage of the tariff bill of 1892, after which the profits were so seriously affected that the business was closed out. In the liquidation which followed there was a loss of $1,583.20 upon the stock held as a part of the trust, and for this the accountants claimed credit in their account. The auditor refused the credit on the ground that the accountants had an opportunity to sell the stock to the cestui que trust for its full appraised value, $8,333.33, and declined to do so, and thus lost on the liquidation the sum of $1,583.20, which the stock realized less than its appraised value. This appraised value was twenty-five per cent in advance of its par value, and was made because of the large profits which had been realized from the business. The court below did not sustain the auditor in his reasoning for the surcharging of the accountants, but held that George E. Bartol should sustain the loss personally, and therefore the accountants, while being

chargeable with the loss so far as it affected the body of the trust fund, should recoup their loss from the future payments to be made of the income to George E. Bartol. The ground upon which the court below held the trustee accountable was that they had no power to invest any part of the fund in the stock of a private corporation, but, because it was stock held by the testator in his lifetime and at the time of his death, the court further held that the whole of the estate of the testator should sustain the loss, and therefore the one sixth of the aggregate loss should be paid by George E. Bartol, and the other five sixths by the other legatees.

We think the learned court below fell into error in this view of the subject by failing to regard one of the provisions of the will. That provision is in the following words, "It is my will that my executors hereinafter named and my said trustees may in their discretion, if they deem it for the benefit of the estate, retain in their hands as assets any investments which I may have and possess at the time of my death, without liability in case of depreciation or loss, and that they shall not invest the funds in their hands in coupon bonds of any kind, and that all investments made by them shall stand in the names of all of them." As the testator expressly directed that the trustees as well as the executors might, in their discretion, retain any of the testator's investments without liability for loss from so doing, they certainly cannot be held liable for doing what they were explicitly authorized to do, without violating a positive provision of the will. We do not regard either the reason given by the auditor or that given by the court as sufficient to warrant the surcharge in question, and therefore sustain the first seven assignments of error.

The second item of surcharge is the loss occasioned by the depreciation in price of the bonds of the Union Railway Company of Chattanooga, $5,360.30. This was an investment of trust funds made by the trustees in the fall of 1890 to the extent of $7,000. There had been an investment of $10,000 in these bonds made by the executors in May, 1888 after a very thorough investigation of the condition and affairs of that company, George E. Bartol himself participating in the transaction. The latter represented to the executors that his father had agreed to buy $5,000 of these bonds but became sick before he

paid for them, and that he, George E. Bartol, had paid the money for them during his father's illness, and asked to be reimbursed for his payment.    This was done and the executors made the investment of $10,000 as above stated.    Afterwards in 1890 the trustees, having some money to invest, consulted with George E. Bartol as to the investment.    Mr. Henry W. Bartol, one of the accountants, testified before the auditor that George E. Bartol authorized the trustees to buy the bonds at 108, and this statement was not denied by the latter.    The bonds were selling at about that price at the time of the investment. The trustees actually paid 107 for them.    The trustees also made investigation through a number of sources as to the condition and character of the property, obtaining amongst other things a copy of Poor's Manual for 1890, with quite full information as to all matters pertaining to its physical condition and operation.    The reports of its earnings and expenses for the previous year, 1889, were given, showing a surplus of $5,117.22 after all expenses and the interest on the bonds had been paid. Dun & Co.'s report made in May, 1888 was already in the possession of the trustees, showing a very favorable physical condition, with thirty miles of completed road, with a full equipment of engines and cars, a gross income of $92,000, and a net income of $40,800, for the year before, and the trustees obtained a number of letters of business men acquainted with the property highly commendatory in character, and certifying to its being a flourishing company, and its bonds a first class investment.

In 1890 the road had been extended eleven miles, making forty-one miles in all, with a total bonded debt of only $600,000, of which the investment now in question was a part of the second $100,000 issued.    There is very much of this testimony which it is not necessary to review in detail because the decision of the court below does not turn upon that question.    The learned court was of opinion that the investment was unauthorized, and therefore the trustees were liable to make good the loss which subsequently resulted.    The clause of the will upon which this question turns is in the following words : " It is my will that my trustees may sell any of my investments, and may sell and resell any investments which they themselves may make, when and as often as they may deem it advisable, and further, that they shall have the right to invest and reinvest the

funds which may at any time come into their hands, in real estate, in first class mortgage bonds of railroad companies whose railroads are finished and earning interest on their entire bonded debt, and in other corporate bonds (secured by mortgage), whether of a public or a private character, also in state and municipal bonds, also in bonds of individuals secured by first mortgage or deed of trust on real estate in any part of the United States, provided that they shall make no single investment exceeding in amount $30,000; the above investments to be in addition to such securities as are recognized by the laws of Pennsylvania as proper for the investment of trust funds."

It will be observed at once that the authority to make investments conferred upon these trustees is very broad and complete, and it was intended and expressly declared to be in excess of the authority conferred by law. The investment, therefore, now in question, is not to be governed either by the limitations imposed by the Pennsylvania statute, or by any other test than that which is exacted by the will. Viewed by this alone we have only to inquire whether the authority conferred by this will was transcended when these trustees purchased the bonds now under consideration. It is not at all disputed that they are mortgage bonds of a railroad company. It cannot be controverted that at the time of the investment the bonds were those of a company which was earning and paying interest upon its entire bonded debt, because in each of the three years preceding, and including the one, 1890, when the bonds were bought, the company not only earned interest on its entire bonded debt, but there was a remaining surplus over and above the interest. This was positively proved and not contradicted. Thus by the testimony of the appellee, O'Brien's report, it was proved that in the year 1888 there was a surplus of earnings, after all interest was paid, of $9,161. For 1889 the surplus was $5,117, and for 1890 it was $708. In the nine months of the year 1887 ending December 31, 1887, the surplus was $10,395.03.

So far therefore, as this requirement of the will is concerned, the investment in these bonds was strictly within its terms. Both the auditor and the court below held that the road was not finished when the investment was made, and for that reason surcharged the accountants as to this item. The reasoning adopted by both seems to be that, because in June, 1888 it was

decided to extend the road, it was not a finished road. In point of fact the road was actually finished in 1885, not only as to its track, but as to its equipment, and it was running on its whole length, and with a full equipment of engines, passenger cars and freight cars, for fully three years before it was decided that it should be extended. Further it was shown by Poor's Manual for 1890 that the extension was completed by adding eleven miles to the length of the road, and that the company then, December 31, 1889, had thirteen locomotives, twenty-four passenger cars and forty-two freight cars. The argument that the road was not finished because at a certain time in its history it was decided to build an extension to it, cannot be sustained. Assuredly when a road is built, is fully equipped and is actually running and doing all the business that comes to it, it must be regarded as a finished road. When an extension of its length was determined upon, the part that was finished before, was finished still. That fact is not changed, the road still remains as a completed structure notwithstanding an addition to it is to be made. Otherwise no railroad can be said ever to be a finished road, because it is always possible, and the fact is almost universally so, that railroads are extended in length beyond their original limits. Moreover it is to be observed that the bonds in question were secured by a mortgage which only covered the original thirty miles of road which had been finished in 1885.

It is matter of public history that all the large railroads of the country are constantly making additions and extensions of their tracks and also increasing their equipment. To hold that such roads must be regarded as unfinished for that reason, would be to antagonize the common sense convictions of the whole business world, and would not be in accord with any legal principles or rulings of which we are advised. We are constrained to differ with the auditor and the court below on this subject, and must hold as we do that this road was a finished road when the present investment was made. This being so, the purchase of the bonds was entirely within the authority conferred by the will of the testator, and the trustees cannot be held liable for the subsequent depreciation in the price of the bonds. It must be conceded under the evidence that the trustees used all the care that a person of ordinary care and prudence would use in determining upon an investment of its personal funds. They

not only obtained the published reports of the company, but consulted with the cestui que trust himself, and other business men who had means of knowledge, and advised the loan.

The point that these were second mortgage bonds and therefore not first class is not well taken.  The will did not restrict the trustees to first mortgage bonds, and it does not at all follow that a second mortgage bond may not be a first class security.  In this case the first lien was a mortgage for only $100,000, a most remarkably small charge upon a railroad of thirty miles in length.  But the second mortgage was given for $200,000, for the very purpose of raising a fund to pay off the first mortgage bonds, and the whole increase of the debt was but $100,000, and the mortgage was a consolidated mortgage for the security of the whole $200,000, which also was a very small lien upon a road of the length that this was.  The propriety of the investment must be judged as it was at the time it was made, and not as viewed in the light of subsequent facts.  Of course these trustees could not foresee that a trolley road would be built through the same town, which would largely impair the business of this road, and they are not responsible for not possessing the quality of prevision which would anticipate such a result.  All the authorities are to this effect.  The testator's investments which were very large and greatly diversified, contained a large number of consolidated bonds, the object of which was to absorb bonds of prior issue, and they were made without loss.  There was no question as to the entire good faith and integrity of the trustees and to their good business qualifications.  The auditor and the court below found, and declared repeatedly, that they were without exception in these respects.  Upon the whole case we are decidedly of opinion that neither of the surcharges can be sustained, and we therefore reverse the ruling of the court below.  The assignments of error are all sustained.  In our judgment there was no legitimate reason for imposing any part of the costs of the audit upon the trustees, and we therefore sustain the fourteenth assignment.

The decree of the court below is reversed at the cost of the appellee, and the record is remitted with instructions to correct the decree in accordance with this opinion.