## Cope's Estate. No. 2

*Henry D. O'Connor*, for beneficiaries, exceptants.

*J. Barry Colahan* and *Townsend, Elliott & Munson*, for accountant, exceptant.

*Louis Spivak*, guardian and trustee ad litem, p. p.

HUNTER, J., April 14, 1944.—Exception has been filed by the trustee to a surcharge imposed by the auditing judge because of the failure of the trustee to dispose of premises 1610 Clark Street, Pittsburgh, which had been acquired in 1936 in foreclosure of a mortgage held by the estate. The surcharge of $1,500 was the difference between the price at which the property could have been sold, $3,000, and the price for which it was actually sold, $1,500. In our opinion the facts found by the auditing judge do not justify the surcharge. The fact that the property was in the worst section of the City of Pittsburgh, and distant from the home office of the trustee in Philadelphia, required extraordinary care in the administration of this investment, yet we cannot find that the trustee failed to exercise such care. In 1937 a colored man offered $2,500 for the property with no down payment, but he agreed to repair it and pay principal at the rate of $30 a month, and the balance in three years. Later he raised his offer to $3,000 with a $300 down payment. The trustee asked the broker to secure from the purchaser a further increase of price in cash, but the broker answered that the prospective buyer had bought another property. Later in 1937 it was leased to the same man for $20 a month, and in 1940 was sold to him for $1,500, of which $500 was in cash. In our opinion, the trustee was not required to accept an offer which included so little cash. It was a situation which called for the exercise of sound business judgment, and a trustee cannot be surcharged for a mere error of judgment. There was no certainty that the purchaser would fulfil his promise, and after payment of broker's commissions the cash to be received by the trustee would hardly pay the expense of regaining possession of the property and for the risk and trouble involved.

The auditing judge commented unfavorably upon the failure of the trustee to see that the former owner paid taxes for 1928, 1929, and 1930. He did not, however,

surcharge the trustee with these taxes, nor do we believe a surcharge should be imposed. Interest continued to be paid until October of 1931. In some instances it may be good management to delay foreclosure and coöperate with an owner who is endeavoring to work out his problems. In any event, this was a matter for the judgment of the trustee, and we can find no abuse of its discretion: Goldman's Estate, 19 D. & C. 65; Smoczynski's Estate, 29 D. & C. 200.

The exception of the trustee is sustained.

Exceptions were filed also by the beneficiaries with regard to the exchange of stock of Land Title Bank & Trust Company and to the compensation awarded to the guardian and trustee ad litem. These exceptions are dismissed for the reasons given in the opinion this day filed in this estate sur trust for Porter F. Cope.

In accordance with the conclusions of this opinion the exception of the trustee is sustained, the exceptions of the beneficiaries are dismissed, and the adjudication is modified accordingly.

LADNER, J., dissenting.—I am impelled to dissent from the majority opinion so far as concerns the exception relating to 1610 Clark Street, Pittsburgh. By sustaining this exception the court en banc sets aside the surcharge imposed for the loss occasioned by the trustee's mismanagement and inattention to the trust investment. The facts are not in dispute, but as the majority opinion does not set them forth in full I deem it essential to restate them.

The investment in question was a first mortgage on premises 1610 Clark Street, Pittsburgh, Pa. While there was no objection to the propriety of the original investment, it appears that originally the application for the mortgage loan in question was $4,000. This was refused mainly because (as the record of the trustee states under date of August 30, 1917) "the dwelling is subject to considerable wear and tear by the class of

tenants which occupy it, and the building is rather old". The application was, nevertheless, approved in the amount of $3,500. Though the appraisement then made, $6,500, made the investment a proper one, the trustee thus had early knowledge of the nature and character of the property, the neighborhood, and the type of tenants in occupancy. Common care and prudence dictated alertness and attention. But the mortgage was not called when due and so careless did the trustee's officers become that they permitted the taxes for *1928* and *1929* to become delinquent even during the pre-depression era. Trustee did no more than send letters to the owner, who not only failed to produce his tax receipts but paid so little attention to the letters that the trustee had to obtain a tax search to ascertain whether the taxes had ever been paid. This tax search, secured September 15, 1930, disclosed that the arrearages amounted to $1,500. The failure of the trustee to enforce the owner's obligation to pay and produce tax receipts of a mortgaged property of the type which the trustee knew needed careful supervision is certainly an indication of inattention.

The property was foreclosed on May 14, 1932. On March 27, 1931, trustee was informed by its correspondent (Potter Title & Trust Company) that the property was in the worst section of the city. On November 6, 1932, the garage at the rear of the property was bombed and destroyed. On January 23, 1933, trustee's employe, Mr. Fuller, reported the property "rapidly being vandalized". In December of that year an estimate disclosed that necessary repairs would cost $900. Several weeks later it was decided to nail sheet iron on all exterior openings. On October 4, 1935, the trustee was warned by the Bureau of Building Inspection of the City of Pittsburgh that "the building was open to the public and was being dismantled". On February 8, 1936, four years after foreclosure, repairs were made to the walls in the sum of $175, which were

first charged to income and then reversed to principal, with a comment, "They [the walls] were practically [when the property was taken over] in the same condition as when we recently repaired them, March 12, 1937".

On April 9, 1937, George Brothers, real estate agents in Pittsburgh, answered the inquiry concerning the property, "the property is so situated that *we can hold no promise whatsoever of disposing of it.* The majority of the tenants in the neighborhood are either poor, colored, or on relief." Three months later (June 29, 1937) an offer of $2,500 was made by a colored man, Mr. Downs, with no down payment but would repair the property and pay $30 a month and balance in three years. The offer was refused July 20, 1937. The same Mr. Downs then raised his offer to $3,000 with $300 cash down payment. A definite answer was asked for by the broker by July 24th "as he has another prospective house that he must accept or reject very soon". The trustee, despite its own agent's warning, apparently could not make up its mind but temporized. Its mortgage committee put off its decision, though on July 27th its own rental administrator was not optimistic over any advantageous rental, *and therefore did not propose to recondition the property.* On July 30, 1937, a general report was received by the mortgage committee from the Potter Title & Trust Company of Pittsburgh that they appraised the property at: land, $840, building, $1,500, or a total of $2,340, in conjunction with discouraging information of the condition of the property, or what was left of it. This report, however, showed that there were no vacancies on either side of the block as of that date, whereas on October 10, 1933, the report showed seven or eight stores vacant. Finally, on August 6, 1937, five weeks after the offer was first received and two weeks after final answer was asked for, the trustee committee asked the broker to secure a further increase of price and cash but the broker answered

that the prospective buyer (Downs) had bought another property. The subsequent history is that on November 1, 1937, the property was leased for $20 a month to this very same colored man who four months previously had offered to pay $300 down, make $900 worth of repairs, and pay $30 a month. Then, in February 1940, the property was sold to him for $1,500, $500 cash and purchase-money mortgage of $1,000.

The guardian ad litem charged that the trustee displayed supine negligence in the administration of this mortgage investment: Hollins' Estate, 29 D. & C. 307. While trustees have the right to invest in mortgages secured on property anywhere in Pennsylvania, yet when a mortgage is taken at so great a distance as Pittsburgh the fact that the same oversight cannot be exercised as in the case of a nearby property should have put the trustee on its guard. Ordinary prudence under such circumstances would have led to a sterner insistence on the owner keeping the terms of the mortgage. Yet tax receipts were not produced for the year 1928 and they were unpaid for that year as well as 1929-1930. Merely writing letters and accepting repeated promises not kept was not giving this investment the care which the circumstances demanded.

There was further inattention in not ascertaining the extent to which the property was being kept in repair. Here again the knowledge of its occupancy by a class of tenants who customarily abuse property demanded alertness on the part of the trustee. So also the trustee's own experience must have informed it that when an owner lets taxes with heavy penalties accumulate he is probably permitting his property to run down. At least an inspection was indicated which seems not to have been made in 1928, 1929, and 1930.

Further, having been warned as early as March 27, 1931, that the property was in the worst section of the city; having experienced difficulty in getting posses-

sion, having had the stable or garage destroyed and the property vandalized, finally having held it vacant from 1932 to 1937, it was supine negligence to have treated so carelessly the "Downs" offer — an offer recommended by the trustee's own agent. This offer was $300 in cash, purchaser to repair the property, pay monthly instalments of $30 for three years, at which time balance of purchase price was to be paid. Such an offer in the circumstances called for serious and prompt consideration. Though warned it must be accepted by July 24th, the trustee procrastinated until August 6, 1937, and so lost the offer. The trustee urges in justification that the cash amount was too small and a second foreclosure might have been necessary. Ordinarily this would be a plausible excuse, but here there was a desperate situation; the property was dilapidated and only occupation could protect against further destruction. The excuse also ignores the fact that the offer included an obligation of the purchaser to put the property in a tenantable condition. Since these repairs were estimated to cost $900 or $1,000, this virtually meant an addition to the purchase price of that sum. Nor is the excuse of cost of reacquisition of the property in case of default a good one; that could have been guarded against by the trustee retaining title. Instalment contracts of sale of real estate with retained title are a familiar means of protecting owners of foreclosed property against such eventuality.

I can come to no other conclusion than that the trustee in administering this investment did not display common skill and common prudence or the caution that an ordinary man would display in the conduct of his own affairs. In Hart's Estate (No. 1), 203 Pa. 480, it was held (syllabus) that where a trustee neither exercises common skill, common prudence, nor common caution and is either guilty of supine negligence in being ignorant of facts which ordinary intelligence would

have disclosed to him or, if known, in not exercising his best judgment upon them, and a loss results, he will be surcharged. See also Bartol's Estate, 182 Pa. 407, and Chambersburg Saving Fund Association's Appeal, 76 Pa. 203.

I would dismiss the exception.