# Neff's Appeal.

1. All that a court of equity requires of trustees is common skill, prudence and caution.

2. Executors, administrators or guardians are not liable beyond what they receive unless in case of gross negligence; when they act as others do with their own goods and in good faith, they are not liable.

3. Especially when a trustee acts under professional advice he will be protected.

4. A guardian is not bound to sue at once, but may leave a debt where he finds it unless there be danger; an executor or administrator is under obligation to diligence to prepare for distribution.

January 13th 1868. Before THOMPSON, C. J., AGNEW and SHARSWOOD, JJ. STRONG, J., at Nisi Prius. READ, J., absent.

Appeal from the decree of the Orphans' Court of *Philadelphia,*

[Neff's Appeal.]

surcharging the account of John R. Neff (deceased), executor, &c., of Charles Bird, deceased, with $1935.05, a balance due from Edwin M. Sellers to Charles Bird, which had not been collected by Mr. Neff, the executor.

Mr. Neff died in 1863, and his fifth account as executor of Mr. Bird, was filed by his executors.

The facts in the case are taken from the findings of William L. Dennis, Esq., the auditor, which were approved by the Supreme Court as being sustained by the testimony in the case.

Edwin M. Sellers was the son-in-law of Mr. Bird, who left a number of children. Mr. Bird furnished the house in which Mr. Sellers went to housekeeping. About the time of Mr. Sellers' marriage, Mr. Bird advanced him $6000, as he had done with his other children. For this sum Sellers gave two notes, dated April 2d 1849, for $3000 each, one payable in eight months and the other in six months, with interest. Mr. Bird died in that year (1849), and Sellers' notes passed into Mr. Neff's hands as part of the assets of the estate.

About the time Sellers received the money from Mr. Bird, he went into business as one of the firm of Hallowell & Sellers, which continued in business two or three years, but was not successful. He then went into business in the firm of Edwin M. Sellers & Co., which continued one or two years, and was also unsuccessful. This firm being largely indebted to Siter, Price & Co. for borrowed money, Charles M. Siter was put into the business with them, under the name of Sellers, Siter & Co. to enable them to go on. The indebtedness of the firm to Siter, Price & Co. continued to increase, and finally, about April 1853 it failed, being indebted to Siter, Price & Co. to the amount of $20,000, which has never been paid. Sellers had many other debts, and his failure was a bad one. He had paid the interest on his notes to Mr. Bird up to April 15th 1853.

Mr. Bird by his will directed that all the debts of his children should be charged to their shares of his estate, and when the balance on Mr. Neff's first account was before an auditor for distribution, the effort was to have the indebtedness of Sellers charged to his wife's share, but the Orphans' Court decided that Mrs. Sellers' share was not liable to this charge. This litigation continued up to about the time of Sellers' open and notorious insolvency. During that time and afterwards Mr. Neff acted under the direction of John Cadwalader and F. W. Hubbell, Esqs., as his legal advisers.

After Sellers' failure he obtained a clerkship, which at first paid him but a few hundred dollars a year.

Mr. Neff, by importunity and constant dunning, obtained from Sellers several sums of money, and about November 1851 the indebtedness was reduced to $5000. At that time, acting under

the counsel of his legal advisers, Mr. Neff induced Sellers to effect an insurance on his life to the amount of $5000, as security for his debt to Mr. Bird's estate. This insurance was kept alive by Sellers, Mr. Neff frequently advancing him the money to pay the premiums as they fell due.

No judgments were obtained against Sellers by any of his creditors, and Mr. Neff never attempted to recover judgment or enforce the payment of the debt by any legal process.

Mr. Neff died in July 1863, having filed four accounts of his administration of the estate of Mr. Bird; the third was filed June 1854, and the fourth January 1858. In the third account he refers to this debt, and states its exact amount, both principal and interest; the payments that Sellers had made on account, the arrangement that had been made in effecting an insurance on his life, and then adds, "Mr. S. says the premium will be promptly paid by him, as it falls due, May 11th and November 11th, each forty-six dollars."

In his fourth and last account he says: "The position of E. M. Sellers' debt to the estate, which was briefly described in a statement appended to my third account, has been in no respect altered, save in the accumulation of interest since. The insurance upon his life is continued."

At the time of Mr. Neff's death the debt of Sellers was barred by the Statute of Limitations.

On the 1st of January 1864 the employer of Sellers gave him an interest in his business. He would not do so until he had ascertained that there were no judgments against Sellers. Sellers had no capital, and put nothing into the concern. He died about a year afterwards, and there were paid to his estate from the concern between $7000 and $8000.

After his death the executors of Mr. Neff received from the insurance company, for the estate of Mr. Bird, the amount of the policy of insurance.

The net proceeds were $4994.20. This sum was the only debit in the account submitted to the auditor. By an account stated by the executors of Mr. Neff, between Mr. Bird's estate and Sellers, it appeared that on the 20th of July 1865 the amount of debits against Sellers was $10,528.99, and that the credits, including the proceeds of the life insurance, were $8593.94, leaving a balance of $1935.05 due the estate of Mr. Bird, with which it was claimed that the account of the executor should be surcharged, mainly on the grounds that he had suffered the Statute of Limitations to bar the debt, and had not obtained judgment against Sellers.

The auditor further found: "That Edwin M. Sellers had not, at the time of his marriage, nor at any subsequent time, until the year he died, any estate of his own; that he did not own any of

the furniture of the house he occupied, and that he controlled as he saw proper the entire income of his wife, after her father's death, using it to pay notes or otherwise, at his pleasure; that the money due the estate of Charles Bird could not have been made by any adverse legal proceedings against E. M. Sellers."

The auditor also says: "Why should Mr. Neff step out of his way and expend the money of the estate in attempting to find assets, where the shrewdest business men of the community saw nothing but helpless, hopeless insolvency?

"But Mr. Neff, although he did not obtain judgment against Sellers (which had it been obtained, all the witnesses agree in saying, would have been an insurmountable obstacle in his path—one that would have converted him into an angry debtor, indisposed to help himself or others), he, under the advice of learned counsel, prevailed upon Sellers to effect an insurance upon his life for the sum of $5000, which was about the amount then due, and which was as large a sum as Mr. Sellers could carry, which policy was assigned to Mr. Neff, who, by his prudent course, induced Sellers to keep this and the substituted policy alive with his own money, until his death, when the accountants were put in possession of the fund, now about to be distributed. After such foresight, diligence and prudence on the part of Mr. Neff, it would be very hard to charge his estate with the difference between the sum realized from the policy of insurance and the debt (principal and interest) due Bird's estate, even if there were authorities to warrant this step. But the auditor can find no such authority, and he therefore declines to charge the estate of J. R. Neff with this difference."

He accordingly refused to surcharge the account of Mr. Neff with the balance due from Sellers. On exceptions to the report by Mrs. Matilda Sprogell, a daughter of Mr. Bird, and the Pennsylvania Company for Insurance on Lives, &c., trustee for Mrs. Sprogell and her children, the Orphans' Court overruled the decision of the auditor and decreed that the accountant should be charged with that balance.

From this decree the executors of Mr. Neff appealed to the Supreme Court, and assigned it for error.

*W. A. Porter*, for appellant, cited Stem's Appeal, 5 Wh. 472; Konigmacher's Appeal, 1 Penna. R. 215; Crist *v.* Brindle, 2 Rawle 122; 2 Comyn's Dig. 603; Blue *v.* Marshall, 3 P. Wms. 381; Calhoun's Estate, 6 Watts 185; Keller's Appeal, 8 Barr 289; Eyster's Appeal, 4 Harris 376; Long's Estate, 6 Watts 46; Johnston's Estate, 9 W. & S. 107; Clack *v.* Holland, 19 Beav. 136; Mitchell *v.* Trotter, 7 Grattan 176; Riddle's Estate, 7 Harris 431; Bradford's Appeal, 5 Casey 513; Miller's Appeal, 6 Id. 478; Mellon's Appeal, 8 Id. 121; White's Appeal, 12 Id.

134; Chew's Appeal, 9 Wright 228; Mahler's Appeal, 2 Id. 221.

*W. F. Judson*, for appellees, cited Powell *v.* Evans, 5 Ves. 839; Lowson *v.* Copeland, 2 Brown, C. R. 157; Gaskell *v.* Harman, 11 Ves. 498; Hayward *v.* Kinsey, 12 Mod. 568; Tebbs *v.* Carpenter, 1 Madd. Ch. 220; Moyle *v.* Moyle, 2 Russ. & Mylne 710; Bullock *v.* Wheatley, 1 Coll. 130; Schultz *v.* Pulver, 10 Wend. 366; Long's Estate, Johnston's Estate, Miller's Appeal, *supra;* Stiles *v.* Guy, 16 Sim. 230; Beckley's Appeal, 3 Barr 425; Charlton's Appeal, 10 Casey 474; Harding's Estate, 12 Harris 189.

The opinion of the court was delivered, January 23d 1868, by

SHARSWOOD, J.—Charles Bird died in 1849. Among his assets were two notes both dated April 2d 1849, drawn by Edwin M. Sellers in his favor, one at six and the other at eight months, each for $3000 with interest from date. These notes were given by Sellers for money advanced by Bird on his marriage with the daughter of the latter. Sellers was, at the time of Bird's death, in business and continued until April 1853, when he became insolvent. He afterwards secured a clerkship which did not yield him enough to support his family. The firm in which he was so employed gave him an interest as partner in the house on January 1st 1864. His death occurred a few months after, and his family received from the firm some seven or eight thousand dollars.

Mr. Neff, the executor of Charles Bird, was paid the interest by Sellers on these notes up to the time of his failure. He also collected from him several considerable sums on account of the principal. In 1851, under the advice of his counsel, he induced Sellers to effect an insurance on his life for the sum of $5000, which he kept alive, and which was paid to Bird's estate at his death. Mr. Neff, himself, died in 1863, before this event. His executors having filed his account as executor, it was referred to an auditor, before whom it was claimed that Mr. Neff should be surcharged with the whole amount of the notes and interest. After two references the auditor reported on the testimony before him that Mr. Neff ought not to be so charged. Upon exceptions to the report, the court below were of a different opinion and decreed accordingly. This is an appeal from that decree.

We think the evidence before the auditor fully justified him in the conclusion at which he arrived. The executor found these notes among the assets. The testator had reposed so much confidence in Mr. Sellers as to loan him this money. His circumstances appear to have been very much the same at the time of the loan and up to the period of his failure. He was in business, but not very successful. A suit, judgment and execution would

[Neff's Appeal.]

have broken up his business without producing any fruits. His house had been furnished by Bird, and the furniture belonged to his wife. Her income from her share of her father's estate was used by him in his business. The different firms of which he was a member during the period from the time of his father-in-law's death up to his failure were all heavily in debt, and a levy and sale of his interest, subject to the payment of partnership debts, would have availed nothing. The interest he obtained in 1864, in the business which produced something for his family after his death, was only after inquiries instituted to ascertain whether there were judgments against him. The ground upon which it is now sought to make Mr. Neff's estate liable is that he did not sue and obtain judgment on these notes before the failure of Sellers in 1853. It is conceded that after his notorious insolvency at that time it was no longer incumbent on the executor to take such a step.

The general rule upon the subject of the liability of trustees has been long and well settled. In 1682 Lord Keeper North, afterwards Lord Guilford, expressed it in this language: " Very supine negligence might indeed in some cases charge a trustee with more than he had received, but then the proof must be very strong:" Palmer *v.* Jones, 1 Vern. 144. " If there was no *mala fides*," says Lord Hardwicke, "nothing wilful in the conduct of the trustee, the court will always favor him:" Knight *v.* The Earl of Plymouth, 3 Atk. 480, Dickens 120. " You cannot affect the trustees," said Lord Thurlow, "with more than they actually received, without wilful default:" Pybus *v.* Smith, 1 Ves. Jr. 193. And so are all the subsequent cases, Rowth *v.* Howell, 3 Ves. 565; Osgood *v.* Franklin, 2 Johns. Ch. Rep. 1; Thompson *v.* Brown, 4 Id. 619; Pym *v.* Downing, 11 S. & R. 66; Johnson's Appeal, 12 Id. 317; Konigmacher's Appeal, 1 Penna. R. 215; Stem's Appeal, 5 Whart. 472. All that a court of equity requires from trustees is common skill, common prudence and common caution. Executors, administrators or guardians are not liable beyond what they actually receive, unless in case of gross negligence; for when they act as others do with their own goods and with good faith and are not guilty of gross negligence, they are not liable: Calhoun's Estate, 6 Watts 185; Crist *v.* Brindle, 2 Rawle 122; Eyster's Appeal, 4 Harris 376. Especially where a trustee acts under professional advice he will be protected: Vez *v.* Emery, 5 Ves. 144; Calhoun's Estate, 6 Watts 189. In the application of the rule to particular cases much must be left to the discretion of the courts: Keller's Appeal, 3 Barr 288. In Long's Estate, 6 Watts 46, the administrator did not bring suit till some years after the death of the intestate, and in the mean time he had secured a claim of his own against the debtor. The court were of opinion that with proper diligence the debt could have been

[Neff's Appeal.]

collected, and held him accountable. In Johnston's Estate, 9 W. & S. 107, the note had been taken by the administrator on a sale of the goods of the intestate. At its maturity the maker and his surety were both able to pay, but the administrator made no demand and took no steps to collect it for more than six months. In Bickley's Appeal, 3 Barr 427, though the note was a part of the assets, yet nothing was done for four years after its maturity, when the maker became insolvent. The distinction between an executor or administrator and a guardian, as recognised in Charlton's Appeal, 10 Casey 474, is undoubtedly a sound one. A guardian is not bound to sue at once, but may leave a debt where he finds it, unless there is reason to apprehend danger; but an executor or administrator is under obligation to diligence in preparing for distribution. He cannot be justified in putting forth no efforts to collect a debt due the estate which he represents for a period of three, four or five years. But the court add in that case: "We do not desire to be understood as holding that an administrator is bound to sue immediately a debt due his intestate or encounter the hazard of personal liability for it; such is not the rule, but he is responsible for the want of ordinary diligence. When he has suffered years to pass by without an effort to collect such a debt or offering any excuse for his failure to proceed, when an auditor on his account has convicted him of gross negligence, we will not reverse the decree of the Orphans' Court confirming the report of the auditor."

We cannot expect to find cases in the books precisely similar to the one under examination. But Keller's Appeal, 8 Barr 288, is in most particulars like this. The circumstances in the present case are much stronger than in that. It was an administrator who was sought to be charged, not a guardian. There, as here, the note was held by the decedent, and the court rely on the circumstance that the administrator only continued a confidence already reposed in the obligor by the decedent. There, as here, payments were made on account, but suit was not brought till the maker had failed, more than eighteen months after the death of the intestate. We have in this case the additional circumstances that the executor acted throughout under the advice of able and distinguished counsel, and, by a wise expedient, secured a very large proportion of the debt. By the account in our paper-book, dated July 26th 1865, it appears that Sellers' whole liability up to that date would have been $10,525.99. Mr. Neff, the executor, by his prudent foresight, secured of that amount $8593.94, leaving a balance of only $1935.05, with which it is now asked that he shall be personally charged. Had he at once sued, obtained judgment, issued execution and sold out the debtor, the probability is that the whole debt would have been lost. To hold him responsible would indeed illustrate the remark of Lord Hardwicke,

7 P. F. Smith—7

[Neff's Appeal.]

that it is the harshest demand that can be made in equity to compel trustees to make up a deficiency not owing to their wilful default: Jackson *v.* Jackson, 1 Atk. 513; Johnson's Appeal, 12 S. & R. 317. Had Mr. Neff been alive to receive the insurance-money and to settle this account, he should have been discharged with a just encomium on his wise foresight and successful fidelity, instead of being condemned as guilty of supine negligence or wilful default.

We are of opinion that the court below ought to have dismissed the exceptions and confirmed the second report of the auditor, and made their decree in conformity thereto.

The decree of the Orphans' Court is reversed, and the record ordered to be remitted to that court with directions to dismiss the exceptions and confirm the report of the auditor and decree distribution in conformity thereto.