## Clay's Estate

*Boyd Lee Spahr* and *Thomas Raeburn White*, for accountant.

*Albert P. Gerhard*, for deceased cotrustee.

*James Francis Ryan*, for beneficiaries.

STEARNE, J., February 13, 1936.—This trust arose under the will of the decedent, who died on November 3, 1911, wherein and whereby, by the sixteenth item thereof, he gave to The Land Title and Trust Company and Alfred H. Williams such part of his estate as they should select, determine, set apart and value and appraise at the sum of $40,000, in trust, to invest, to collect the income and to pay over the net income to or for the maintenance and support of his granddaughter, Ruth Hill, during her life, subject to certain spendthrift and separate use provisions, and he further provided that after her death, in case she should die leaving children living at the time of her death, the principal of the trust should be paid over to such children as might be living at the time of her death in equal shares per stirpes, with further provisions in case of her death without leaving children to survive her not now material and therefore not recited.

The account is filed for audit and for confirmation, and for the purpose of having the court pass upon certain questions raised which will be discussed in detail hereafter.

Ruth Clay Hill, decedent's granddaughter and life tenant of the trust mentioned in the item of the will paraphrased above, is living and the trust therefore continues for her benefit. Her children are stated to be Howard Livingston Hill, Lila A. K. Hill and H. G. Clay Hill, the first named being of age, but the last two named being minors, although it would appear from

counsel's appearance slip that Lila A. K. Hill attained her majority in April, 1935. The Girard Trust Company is guardian of the estate of the minors, and John Kent Kane, Esq., was appointed guardian ad litem to represent their interests in this proceeding.

Alfred H. Williams, the individual cotrustee, died on April 14, 1930, but an appearance has been entered for his executors. The account is stated by the remaining corporate trustee. By reason of a merger The Land Title and Trust Company, named as cotrustee in the will, is now The Real Estate-Land Title and Trust Company.

In order to clarify the situation before proceeding with a discussion of the questions involved it will be necessary to recite briefly the prior record in this estate. The decedent's will erected four separate trusts: $75,000 for the benefit of Harry G. Clay, Jr., $40,000 for the benefit of Ruth Hill (the trust presently under consideration), one half of the residue of the estate for the benefit of Mary Francis R. Ewart, and the other one half of the residue for the benefit of Helen Maude Clay. These four trust funds were awarded to trustees by adjudication of the late Judge Gest, sur the first account of the executors, dated January 14, 1913. A schedule of distribution was at that time ordered to be filed. Subsequently a schedule of distribution was submitted, but by supplemental adjudication dated November 25, 1914, Judge Gest, for reasons therein stated, declined to approve the same. The record discloses that no other schedule was presented or approved.

However, a second account of the executors was subsequently filed and credit is taken in distribution for the $40,000 trust fund composed of the same assets as are now shown in the account before me. This account was adjudicated by Judge Gest on February 24, 1919, and the account (showing such distribution and its composition) was subsequently confirmed absolutely. The account now before me is the first account filed by the

trustees of this $40,000 fund, although there have been other accounts filed by the trustees in each of the other three trusts.

I am therefore of the opinion that, in the circumstances, the account now under consideration is properly stated, although not based upon a schedule of distribution as ordered. The assets accounted for were included in the distribution account shown in the second executors' account, and, that account having been confirmed absolutely, such action by Judge Gest made the schedule of distribution originally ordered by him unnecessary, and cured whatever defect might have been shown in the record, thus making the procedure to date regular.

This trust as originally set up, as indicated above, was composed of the following trust res:

| | |
|---|---:|
| 4 mortgages, aggregating in amount | $12,700.00 |
| 20 shares Citizens' Passenger Railway Company | 5,600.00 |
| 40 shares Philadelphia Company for Guaranteeing Mortgages | 6,400.00 |
| 30 shares Land Title and Trust Company | 15,000.00 |
| Cash | 300.00 |
| Total | $40,000.00 |

Certain of the mortgages were paid off, and on October 29, 1919, 15 additional shares of stock of The Land Title and Trust Company (hereinafter referred to as Land Title stock) were purchased by the trustees in the exercise of rights to subscribe at $400 per share.

On June 27, 1923, 20 additional shares of stock of the Philadelphia Company for Guaranteeing Mortgages (hereinafter referred to as the Philadelphia Company) were purchased by the trustees in exercising rights to subscribe at $150 per share. In 1927 The Land Title and Trust Company was merged with two other trust

companies to form The Real Estate-Land Title and Trust Company, and in connection with the merger the trustees received 52 3/6 shares of the common stock of the new company and 45 shares of stock of the Land Title Building Corporation which owns the building in which the trust company's offices are located. The fraction of a share was sold and the remaining 52 shares were subsequently exchanged for 520 shares of stock of The Real Estate-Land Title and Trust Company, the par value having been reduced from $100 to $10 a share.

According to the summary in the present account the trust res now consists of:

| | |
|---|---|
| 300 shares Philadelphia Company.. | $9,400.00 |
| 520 shares Real Estate-Land Title and Trust Company .......... | |
| 45 shares Land Title Building Corporation .................... | 20,640.00 |
| Other assets (not in question) ... | 9,868.46 |
| Items of cost for filing the account, etc., credit for which is taken in the account .................. | 91.54 |
| Total ........................ | $40,000.00 |

The life tenant and remaindermen object to the account and seek to surcharge the accountants upon two grounds: (1) That the trustees were negligent in retaining the stock of The Land Title Company and the Philadelphia Company, and in purchasing additional shares thereof in the exercise of their right to subscribe; (2) that the trustees violated the directions contained in the will with respect to the purchase of the additional shares of stock.

The sixteenth item of the will which erects the trust contains the following language:

"SIXTEENTH. I give, devise and bequeath unto the said The Land Title and Trust Company and to Alfred H. Williams, and to the survivor of them, such part of my estate, real or personal, as they shall deter-

mine, select, set aside and apart, and value and appraise at the sum of Forty thousand dollars, IN TRUST to invest the same in the manner hereinafter authorized and to keep the same invested, with full power from time to time to change investments and again reinvest, and to collect the income, rents, issues and profits thereof, and to pay over the net income to or for the maintenance and support of my said granddaughter, Ruth Hill, during the full term and period of her life, so that the same shall not be subject to her debts, contracts, or engagements, or to the control of her husband, and without power on her part of anticipation, pledge or alienation, and so that the same shall not be liable to attachment, execution, or other legal process. AND from and immediately after the death of my said granddaughter, in case she shall die leaving child, children, or issue living at the time of her death, then IN TRUST to pay over, assign, and transfer all of the said trust estate to such child, children or issue as may be living at the time of her death, in equal shares, per stirpes. AND in case my said granddaughter shall die without leaving child, children or issue to survive her, then IN TRUST to hold, convey, transfer and assign the said trust estate to and for the use of such person or persons and for such estates, limitations and provisions as she shall direct, declare, limit and appoint by her last Will and Testament. AND in case my said granddaughter shall die intestate and without leaving child, children or issue living at the time of her death, then IN TRUST to hold, convey, assign and transfer the said trust estate to and for the use of such person or persons and for such estates and in such proportions as the same would vest in under the intestate laws of Pennsylvania had my said granddaughter died a widow, intestate, seized and possessed of the same absolutely, in her own right."

The nineteenth, twentieth and twenty-fifth items of the will relate to the administration of this and the other trusts, and they read as follows:

"NINETEENTH. I authorize my Executors and my Trustees or Trustee, in their discretion, to retain any of the investments or assets or real estate which I may own at the time of my death, or to sell and convert the same, without liability for depreciation or loss by reason of the exercise of such discretion or otherwise than arising from negligence of my said Executors and Trustees or Trustee."

"TWENTIETH. Subject to the preceding discretion vested in my Executors and Trustees or Trustee, to retain or convert securities which I may own at the time of my death, I authorize and request (but without directing) them to invest in such bonds, securities or investments as they in their discretion may deem satisfactory, having regard as well to the security of the principal as to obtaining a fair rate of interest, including bonds of railroads, and public or private corporations, bonds and mortgages on real estate in Pennsylvania, ground rents, approved stocks such as the guaranteed or underlying stock of street railways, or Water or Light Companies; *provided that any one investment shall not exceed thirty thousand dollars (or thereabouts) in one security;* without liability on the part of my Executors and Trustees or Trustee for depreciation or loss arising from the exercise of honest judgment or discretion in making such investments, without negligence."

"TWENTY-FIFTH. I authorize my Executors and Trustees or Trustee in their discretion to vote and appoint a proxy or proxies to vote at any election of any corporation in which my estate may hold stock or be interested; to become a party to any reorganization plan or agreement; to retain and pay counsel for advice or other professional services; to appoint agents and attorneys in fact for the transaction of business, being responsible only for due care in the selection and retention of such persons; and generally I desire to vest in my Executors and Trustees all such general and particular powers which may be necessary or convenient to

enable them to attend to all the business of my estate in the most direct and efficient way, without being required to apply to any court, and without being unduly hampered by personal liability for unfavorable results of any action they may take in good faith and with such care as a reasonably prudent business man would ordinarily take in the management of his private affairs."

It is most clear that the decedent expressly empowered his trustees to select from his estate, as part or the whole of any of the trusts therein created, whatever securities they chose, not limiting them to legal investments. The trustees were also authorized, without liability, to retain nonlegal investments and to purchase others.

The measure of a fiduciary's liability for retaining a nonlegal investment, where he is expressly authorized to retain the same, has been stated by the late Judge Gest in Dickinson's Estate, 21 D. & C. 247, 250 (affirmed in 318 Pa. 561), where Judge Gest wrote:

". . . the degree of vigilance which a fiduciary owes to an estate is variously defined as the exercise of such diligence and care as a man of ordinary prudence would practice in the care of his own estate; Fahnestock's Appeal, 104 Pa. 46; and common skill, common prudence, and common caution; Detre's Estate, 273 Pa. 341. In Taylor's Estate, 277 Pa. 518, and Brown's Estate, 287 Pa. 499, the rule is somewhat more specifically stated that, where a trustee continues to hold nonlegal investments after a time when he could probably dispose of them, and a loss occurs, he must be held liable for a failure to exercise due care, unless he shows that his retention of the securities in question represents not a mere lack of attention but an honest exercise of judgment based on actual consideration of existing conditions, and he will not be permitted to substitute inaction, or supine negligence, for the degree of care required of him.

"Applying this rule to the present case, the auditing

judge concludes that the trustee, having adequate authority under the will to retain these investments, will be liable to a surcharge only for a failure to study carefully the circumstances and conditions that controlled the value of the investments, or, if he has made such a careful study, for failure to act intelligently with respect thereto."

In Detre's Estate, 273 Pa. 341, it is stated at page 350 as follows:

"All that a court of equity requires from a trustee is common skill, common prudence and common caution, and he is not liable when he acts in good faith as others do with their own property: Semples' Est., 189 Pa. 385; Wood's Est. [272 Pa. 8], supra; Neff's App., 57 Pa. 96. Furthermore, a trustee will not be held personally liable for an honest exercise of a discretionary power, in the absence of supine negligence or wilful default (Bartol's Est., 182 Pa. 407; Chambersburg Saving Fund Association's App., 76 Pa. 203, 227)".

Insofar as the retention of the stock in question, or the exercise of the rights to subscribe for new stock, is concerned, I am of the opinion that there has not been proven any failure by the fiduciary to study carefully the circumstances and conditions that controlled the value of the investments, or failure to act intelligently with respect thereto. Upon the contrary, it was shown that the officers and committee of the fiduciary gave every consideration to the question, both as to the advisability of retention of the stocks, and concerning the propriety of exercising the rights to subscribe to the new stock. I deem it unnecessary to go into a detailed discussion of the facts and circumstances which led the trustee to the conclusion that it was wiser to retain the stock rather than to dispose of it, and to purchase the new shares under the exercise of its rights to subscribe. It will suffice to say as to both stocks, despite a falling market, that both corporations continued to pay satisfactory dividends through the year

1931, and the book values and earnings continued satisfactory. The drop in market value of the stock of the Philadelphia Company was subsequently so precipitate that it was impossible to dispose of it. The statements of The Land Title Company reveal that while there have been tremendous declines in the market value of its shares, nevertheless, the company is still in a sound financial condition.

It is true that the fiduciary possessed an investment in its own corporation, and in a corporation closely affiliated with it, but it is to be remembered that the decedent himself owned the bulk of these shares in his lifetime, and expressly passed them on to the trustee as part of the trust. Similar situations existed in O'Brien's Estate, 18 D. & C. 501, and Maser's Estate, 21 D. & C. 559. There is not the slightest basis in the present case for the inference that the reason for the failure of the fiduciary to sell was a desire on the part of the officials of the corporation to protect the market value of its stock, rather than their desire to protect the trust estate. It is contended by counsel that because of the knowledge of the officers of the fiduciary concerning the situation of the market, and the internal affairs of both corporations, such officers knew, or ought to have known, that both stocks were in a precarious situation and they should have sold forthwith. However, there is not the slightest evidence produced in support of such a contention. As was stated by the late Judge Henderson in Wanamaker's Estate, 8 D. & C. 569, at page 576: "It has been ruled many times that opportunity is not evidence, and conjecture and suspicion do not take the place of testimony." While it may be unfortunate that the result of the exercise of the trustee's discretion may not have been as satisfactory as it was contemplated, yet it is a principle well established that hindsight will not be substituted for foresight in determining the liability of a fiduciary. See Brown's Estate, 287 Pa. 499, 503; Dickinson's Estate,

318 Pa. 561, 563; and Linnard's Estate, 16 D. & C. 143, 149. I find as a fact that the trustee, under the evidence, acted with common skill, prudence and caution, and in entire faith, and with an entire absence of negligence or wilful default.

It is also to be observed that the life tenant who now complains concerning the action of the trustee in exercising its right to subscribe to the stock of the Philadelphia Company subscribed herself, in her own individual right, to such stock at the same time that the trustee so acted. Furthermore, neither the life tenant nor the remaindermen have requested a sale of these stocks, but regularly received the income therefrom and had full knowledge and information at all times concerning the investments.

The remaining consideration is whether or not the trustee violated the directions contained in the will concerning the purchase of additional shares of stock in the exercise of the rights to subscribe. As heretofore stated, the trustees were given extremely broad authority and wide latitude concerning the retention of securities possessed by the decedent, and as to the purchase of additional securities. The only restriction is found in the twentieth item of the will, which reads in part as follows: ". . . provided that any one investment shall not exceed thirty thousand dollars (or thereabouts) in one security".

It is to be noted that the clause must be read in connection with the whole item, which commences: "subject to the preceding direction vested in my Executors and Trustees or Trustee to retain or convert securities which I may own at the time of my death". I am clearly of the opinion that the restriction not to invest more than "thirty thousand dollars (or thereabouts) in one security" refers solely and exclusively to new investments to be made by the trustees, and has absolutely no relation to securities already owned by the testator (which he authorized his trustees to retain), and further-

more that such restriction applies to the trusts separately and not to his estate as a whole.

I am led to this conclusion because the nineteenth item authorizes the trustees to continue any security which testator owned at the time of his death without liability for so doing. The next item, the twentieth, contemplates new investments and "subject to the preceding direction" (i. e., the right to retain nonlegal securities) the testator authorized new purchases of nonlegal investments subject to the restriction that "any one investment shall not exceed thirty thousand dollars (or thereabouts)". As these new investments did not exceed that amount the trustee acted clearly within its rights.

For the reasons noted the application for surcharge is refused and the account will be confirmed as stated.

The cost of filing the account and affidavit thereto, $90.50, is credited against principal in the account. Counsel, on their appearance slip, ask for $350 as additional credit for counsel fee, and cost of affidavit to the petition for distribution. Ordinarily, under our practice, all these costs, aggregating $441, would be charged against income, but under the circumstances as they exist in the present accounting, the account having been filed for the equal benefit and information of both life tenant and remaindermen and both having made application for the surcharge which has been refused, it is equitable to apportion the costs equally between principal and income. Such an adjustment in the balances will be noted before awards are made hereunder. . . .

And now, February 13, 1936, the account is confirmed nisi.